The opinion of the Court was delivered by
Dunkin, C. J.
By the “Church Act” of 1706, Charles-town and the Neck between Cooper and Ashley rivers, as far as a certain boundary therein designated, constituted a distinct parish, known as the Parish of St. Philip in Charlestown. In 1751, this parish was divided, and “that part of Charlestown on the southward of the middle of Broad street ” was declared a distinct parish by the name of the Parish of St. Michael.
On 7 April, 1770, (7 Stat. 93,) an Act was passed for the purpose (among other things) of laying out and establishing several new streets in the northwest parts of Charlestown; and for empowering the vestry and church-wardens of the Parish of St. Philip to lay out part of the glebe land in the said parish in lots, and to let the same on building leases. It is recited in the Act that the proprietors of the lands in the said northwest part of Charlestown commonly called Coming’s Point, and the lands adjacent thereto, had, by their *134 petition, prayed that the same might be done; and it was further recited that whereas, by the laying out of the streets aforesaid, according to a plan thereto annexed, a great part of the large and ancient glebe of St. Philip’s Parish, Charlestown, might be divided and put into lots, which might be leased out to great advantage, for the benefit of the rector or minister of the said parish, and for other purposes therein mentioned, and will still leave a large and commodious parcel of land for the habitation, use, and occupation of the said rector or minister; and it was furthermore recited that the rector and the vestry and wardens of the said parish were desirous that the same should be done. Provision was thereupon made that the new streets should be opened at the expense of the proprietors of the lands, and they were thereby declared public streets, &c. By the sixth clause of the Act the vestry and church-wardens of the said Parish of St. Philip were authorized, directed, and required to lay out a parcel, not exceeding four acres, of the land for the building a new parsonage, &c.; and that, when the parcel is so laid off, the vestry and wardens shall divide and lay out all the remaining parts of the said glebe into so many lots, &c., as they in their discretion shall think most proper and advantageous, to be let out by them on written leases, with reserved rents thereon, for the use of the rector and such other use as is thereinafter declared, for any term not exceeding thirty-one years ; and the vestry and wardens are thereby empowered to make such leases, “ with proper covenants, to be inserted therein, for the better improvement of the said lots of land, with buildings thereon, and for the more easy recovery of the rents to be reserved, &c., and from time to time, after the expiration of the said leases, to renew the same; provided, such renewed leases do reserve the same rent, or a greater rent, not exceeding as much again as the first rent reserved by the former lease, and do not exceed the *135 said term of thirty-one years, and so on, from time to time, forever hereafter, as such renewed leases shall expire; and that, on every such renewal of the lease, &c., the lessee do pay a fine equal to two years rent reserved on such first-made lease or leases as a further consideration for the renewal of such lease; and provided, that in all cases of renewed leases, forever hereafter, the original lessee or lessees of the said land, and their executors, administrators, and assigns, shall always have the preference of such renewed leases.”
In pursuance of the directions of this Act, the vestry and wardens of the Parish of St. Philip, in December, 1770, caused the glebe lands to be surveyed, and laid out into thirty-eight lots, and put them up for sale. At this sale (as the plaintiff alleges) Charles Pinckney purchased the lots Nos. 19 and 20, at the yearly rent of £29, then late current money, equal to seventeen dollars and seventy-six cents ($17.76) for each lot.
It may be here remarked that, subsequent to the survey and sale aforesaid, to wit, in 1797, by indenture duly recorded in the office of Eegister of Mesne Conveyances for Charlestown, the glebe lands were partitioned between the churches of St. Philip and St. Michael, and that, in such partition, the lots Nos. 19 and 20 (among others) were assigned and set off to the Parish of St. Philip.
On the expiration of the leases to Charles Pinckney, (A. D. 1801 or 1802,) the same were renewed to William Greenwood, assignee of Charles Pinckney, on leases to expire 25 March, 1833; which leases became afterwards vested in Eichard Lord, trustee of John Horlbeck and Maria his wife.
On the day last mentioned, to wit, 25 March, 1833, two several indentures were executed between the vestry of St. Philip and Mr. Lord, in which the Act of 1770 and the subsequent proceedings are recited, and that Mr. Lord had *136 paid a fine of thirty-five dollars and fifty-two cents on each lot, being equal to two years rent reserved on the first-made leases, and had agreed to pay the yearly rent of thirty-five dollars fifty-two cents, for the purchase of the renewal leases of each lot; the vestry thereupon demised to him the said lots, by their respective descriptions, to hold for thirty-one years, yielding the rent of thirty-five dollars fifty-two cents for each lot, to be paid annually. If the rent was in arrear , for twenty days, lessors were entitled to enter and eject the lessee, and with a power of distress also reserved to enforce payment of the rent. The lessee covenanted, also, in addition to the rent, to pay all State and other taxes and rates, and, at his own costs and charges, to erect on each lot a substantial two-story house, 36 by 18 feet, on the one, and 30 by— on the other, with ceilings at least nine feet in the clear, and to keep the same in tenantable repair, and at the end of the term, or other sooner determination thereof, to leave and surrender the buildings and all the improvements to the lessors. It was also provided that the lessor should, at the expiration of the leases, renew the same, according to the directions of the Act, on request made in reasonable time, and the lessors reserved the right to enter to view the premises twice a year.
In August, 1839, lessors extended the*time for the building thereon until 25 March, 1846, and on 28 April, 1842, the lease of lot No. 19 was assigned to the plaintiff, who has erected very valuable buildings on the lots, and has always paid his annual rents.
The leases expired 25 March, 1864, and the plaintiff had previously applied for a renewal of the same, tendering payment of the same fines, and an agreement to pay rent as provided in the indenture of 25 March, 1833, which the defendants declined to grant unless he would covenant to pay double the rent reserved by the last mentioned indenture.
*137 By the decree filed 28 November, 1866, the defendants were required (among other things) to renew the leases for the term of thirty-one years, from 25 March, 1861, and that the rent reserved should not exceed the rent reserved by the leases of 25 March, 1833.
The defendants have appealed, on the ground that, according to the provisions of the Act of 1770, they have the right to increase the rent to be reserved upon each renewal lease, not exceeding as much again as the rent reserved in the lease last expired.
From the foregoing statement, it is manifest that the sole question for the consideration and judgment of the Court is, the true construction of the Act of 1770, as to the rent to be reserved'on the renewal of leases, which the defendants are confessedly required in perpetuity to make. The plaintiff relies on this Act, and the covenants made in pursuance of it. If it was not passed at the instance of the defendants, (or their predecessors,) it was certainly enacted with their consent, and with the view of advancing the interests of the church which they represented, as well as for the public benefit. Both parties base their rights on the provisions of the Act of 1770; and the question would seem to be properly circumscribed to the grammatical construction of a legislative enactment. But the argument has taken a wider range. On the one side, it is urged that the conduct of the parties has been in accordance with the construction on which the plaintiff insists, while the defendants submit that the Court “should lean against a construction which would render the terms of renewal improvident, absurd, and, unequal,” as against the lessors, the vestry and wardens of the church.
If it be meant that the conduct of the successors of the former vestry and wardens, done thirty-one or sixty-two years after- the enactment, can be relied on to aid the Court in the construction of a statute, the proposition seems not *138 sanctioned by any of tbe numerous authorities cited. But the duty of analyzing these cases is rendered superfluous, as the evidence indicates no past act of the defendants, in reference to former renewals of the plaintiff’s lease, inconsistent with the construction on which they now insist. The true rule seems, however, to be, that, for the purpose of giving construction to an instrument of this description, the Court should look only at the instrument itself, and at the subject-matter to which it related. Sec. 1, Platt on Leases, 730, and the authorities there cited. To this extent the Court is at liberty to invoke the aid of external evidence, whether in relation to a deed inter partes, a will, or an Act of the Legislature.
Looking then at the subject-matter, it appears (from the concessions of counsel) that these glebe, lands consisted of some seventeen acres of unimproved ground, vested in St. Philip’s Church, under a deed from Mrs. Afra Coming, dated 10 December, 1698, lying in the northwest part of Charlestown, and portion of the land called Coming’s Point. The Act of 1770 required the vestry and wardens to lay out these lands in lots, and to grant leases of the same, with reserved rents thereon, giving them power to execute such leases, with proper covenants, for the better improvement of the said lots of land, with the buildings thereon,- and for tbe more easy recovery of the rents to be reserved by the said leases, and, from time to time, after the expiration of the said leases, to renew the same.
Then follows the proviso under which more than one difficulty has arisen: Provided, “ that such renewed leases do reserve the same rent, or a greater rent, not exceeding as much again as the first rent reserved by the former lease, and do not exceed the said term of thirty-one years, and so on, from time to time, forever hereafter, as such renewed leases shall expire.” In Black vs. P. E. Church St. Philip, and Laurans vs. Same, Ms. Ct. Appeals, March, 1835, *139 it was held that, under the provisions of this Act, the lessees and their assigns were entitled to a perpetual renewal. The inquiry remains as to the rent to be reserved on such renewal. The proviso contemplated perpetual renewal. Without expunging the word "first,” what other construction can be given than that adopted by the Circuit Court ? If the word be expunged, then, and not till then, can the ambiguity be created, and the defendants be entitled to contend, as urged in their ground of appeal, that "rent reserved by the former lease” meant "'rent reserved in the former lease” last expired. The Court has no authority to expunge or disregard any word of the enactment, but, on the contrary, is bound to give to every word its full effect and meaning, and for this purpose may, if necessary, transpose the words. In this way the sentence may well be read, " reserving a rent not exceeding as much again as the rent reserved in the first of the former leases,” which, would, of course, remove any ambiguity; and the succeeding words of that sentence are thus also perfectly intelligible, "and so on, from time to time, forever hereafter, as such renewed leases shall expire.” Had it been intended, on the contrary, that, on every renewal forever thereafter, the church should be at liberty to double the rent on the lessees, the natural and obvious language would have been, reserving at each renewal “ a rent not exceeding as much again as that reserved in the preceding lease,” and so on, from time to time, forever thereafter, &c.
But the Act provides for something more to be done by the lessee at each renewal, and so on forever. It is declared that, on every such renewal of the lease of any of the said lands, the lessee “shall pay a fine equal to two years rent reserved on such first-made lease or leases.” It is not suggested that any ambiguity here exists, or that, at any subsequent renewal, the lessee should be required to pay a greater fine than double the annual rent reserved by *140 the leases of 1770. The terms used are not identical, but the variance is so slight as not to disturb the conviction that the mind contemplated the same object. Double the first rent reserved by the former' lease, or “ as much again, as t.he first rent reserved by the former lease,” mean the same, and were intended to mean the same, as “two years rent reserved on such first-made lease.” The difference in the application is, that the fine at every renewal was uniform and fixed, while the annual rent might be varied, provided it never exceeded double the rent reserved in the original or first-made lease. Such is the construction of the Act which was adopted by the Chancellor, and this Court concurs in the conclusion.
Nor is it perceived that this construction renders the covenant, on the part of the vestry and wardens, “ improvident and unequal,” as urged in the argument. In the matter of the Lawford Charity, 2 Mer. 453, Lord Eldon, commenting on the objection that the rent reserved on the lease was too low in reference to the actual value, says: “It ought to be remembered that the case of a charity estate is one in which, of all others, the security of the rent is the first object to be regarded; and therefore, in such cases, the inadequacy of the rent reserved is less a ground of objection.” These were originally unimproved lots, of moderate dimensions — sixty feet front, by one hundred and eighty feet in depth. The annual rent first reserved on each lot would be about seven per cent, on a supposed valuation of two hundred and.fifty dollars for the fee simple of the premises. The Act contemplated the improvement of these vacant lands, and building leases of thirty-one years were, in general, if not uniformly, granted. The lessee covenanted, not only to pay all State and other “ taxes, rates, and assessments imposed or to be imposed on the premises,” but to erect on each lot a good, firm, and substantial two-story house, of prescribed dimensions, and *141 to keep the same in tenantable repair, and at the expiration of the term, or other sooner determination thereof, to leave and surrender the buildings and improvements to the lessors. The most ample, efficient, and summary provisions are made for securing the prompt payment of the rent, which might be, at any time, in arrear; not only by leave to enter and take possession, and oust the lessee, but also by distress, &c. It is maintained by very high authority that such covenant to keep in repair imposes on the lessee or his assignee the obligation to rebuild, if the premises be burnt by an accidental fire. Bullock vs. Dommitt, 6 T. R. 650; 2 Chit. 608. When to this is added the consideration that, on the forfeiture or failure to renew the lease, &c., the lessors were entitled, not only to the land, but to all the improvements thereon, without further compensation, it is not easy to perceive that the administrators of Mrs. Afra Coming’s charity were* unmindful of the duties of their trust when, in 1770, they consented to an Act which restricted their reserved rents on future renewals to double the original rents on lands which were to derive their enhanced value mainly from improvements to be made at the expense of the lessees, and. without any additional burthen on the trust; nor could their successors be justly charged with acceding to improvident and unequal terms, if, as suggested at the bar, they, in subsequent renewals, acted on the construction of the Act of 1770 now adopted by the Court.
It is ordered and decreed that the appeal be dismissed.
Wardlaw and Inglis, J. J., concurred.

Appeal dismissed.